IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No.    1:24-MJ-325 |
| GOKHAN GUN, | |
| *Defendant*. | |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Madison Ramsden, being duly sworn, hereby depose and state:

### BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Washington Field Office. As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I have been in this position since 2019. I am currently assigned to a squad that investigates national security matters. I have received training at the FBI Academy in Quantico, Virginia, including training specific to counterintelligence and espionage investigations. I have also received training regarding the proper handling of classified information. I have not included every detail of every aspect of my training, education, and experience but have highlighted those areas most relevant to this Affidavit.

2.      This affidavit is submitted in support of an application for a criminal complaint charging Gokhan Gun (hereinafter, "GUN") with the unauthorized removal and retention of classified documents or materials, in violation of Title 18, United States Code, Sections 1924(a). Specifically, that GUN, being an officer, employee, contractor, or consultant of the United States,

and by virtue of such office, employment, position, or contract, being possessed of documents or materials containing classified information of the United States, as defined in 18 U.S.C. § 1924(c), knowingly removed such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location.

3.      The facts set forth in this affidavit are based on my personal knowledge and review of records, documents, and other physical evidence obtained during this investigation, as well as information conveyed to me by other law enforcement officials. This affidavit does not include each and every fact observed by me or known to the government. I have set forth only those facts necessary to support a finding of probable cause.

## STATUTORY AUTHORITY AND DEFINITIONS

4.      Under 18 U.S.C. § 1924, "Whoever, being an officer, employee, contractor, or consultant of the United States, and, by virtue of his office, employment, position, or contract, becomes possessed of documents or materials containing classified information of the United States, knowingly removes such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location shall be fined under this title or imprisoned for not more than five years, or both." This section defines the term "classified information of the United States" to mean "information originated, owned, or possessed by the United States Government concerning the national defense or foreign relations of the United States that has been determined pursuant to law or Executive order to require protection against unauthorized disclosure in the interests of national security."

5.      Under Executive Order 13526, information in any form may be classified if it: (1) is owned by, produced by or for, or is under the control of the United States Government; (2) falls within one or more of the categories set forth in the Executive Order [Top Secret, Secret, and

Confidential]; and (3) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security. Where such unauthorized disclosure could reasonably result in damage to the national security, the information may be classified as "Confidential" and must be properly safeguarded.

6.      Where such unauthorized disclosure could reasonably result in serious damage to the national security, the information may be classified as "Secret" and must be properly safeguarded. Where such unauthorized disclosure could reasonably result in exceptionally grave damage to the national security, the information may be classified as "Top Secret" and must be properly safeguarded.

7.      SCI means classified information concerning or derived from intelligence sources, methods, or analytical processes, which is required to be handled within formal access control systems. Special Intelligence, or "SI," is an SCI control system designed to protect technical and intelligence information derived from the monitoring of foreign communications signals by other than the intended recipients. The SI control system protects SI-derived information and information relating to SI activities, capabilities, techniques, processes, and procedures.

8.      Classified information of any designation may be shared only with persons determined by an appropriate United States Government official to be eligible for access, and who possess a "need to know." Among other requirements, in order for a person to obtain a security clearance allowing that person access to classified United States Government information, that person is required to and must agree to properly protect classified information by not disclosing such information to persons not entitled to receive it, by not unlawfully removing classified information from authorized storage facilities, and by not storing classified information in unauthorized locations. If a person is not eligible to receive classified information, classified information may not

be disclosed to that person. In order for a foreign government to receive access to classified information, the originating United States agency must determine that such release is appropriate.

9.      Pursuant to Executive Order 13526, classified information contained on automated information systems, including networks and telecommunications systems, that collect, create, communicate, compute, disseminate, process, or store classified information must be maintained in a manner that: (1) prevents access by unauthorized persons; and (2) ensures the integrity of the information.

10.     32 C.F.R. Parts 2001 and 2003 regulate the handling of classified information. Specifically, 32 C.F.R. § 2001.43, titled "Storage," regulates the physical protection of classified information. This section prescribes that Secret and TOP SECRET information "shall be stored in a GSA-approved security container, a vault built to Federal Standard (FHD STD) 832, or an open storage area constructed in accordance with § 2001.53." It also requires periodic inspection of the container and the use of an Intrusion Detection System, among other things.

## GUN'S BACKGROUND

11.     GUN was born in Istanbul, Turkey. He initially entered the United States on an H1B nonimmigrant work visa in 2001 for a telecommunications company. He listed his employment as network engineering services. In July 2012, GUN received lawful permanent resident status.

12.     GUN became a naturalized United States Citizen on July 4, 2021. He did not renounce his Turkish citizenship and thus possesses dual citizenship. In addition to the properties indicated herein, GUN owns at least one other property in Virginia and properties in Texas and Miami-Dade County, Florida.

13.     GUN has taken fifteen international trips in the past twenty years, to Turkey and to other European and Middle Eastern countries. I have no reason to believe he has ever previously

traveled to Mexico. These trips vary in duration but typically last two weeks. During a prior trip GUN remained overseas for six weeks.

14.    GUN is a civilian employee of the United States Department of Defense (DoD), and works at a facility located in the Eastern District of Virginia. GUN has held his current role—electrical engineer—since approximately September 2023. Because of GUN's employment with the DoD, GUN possesses a TOP SECRET security clearance with access to Sensitive Compartmented Information (SCI).

15.    On or about September 25, 2023, GUN signed a Classified Information Nondisclosure Agreement. Additionally, on or about December 12, 2023, GUN signed a Sensitive Compartmented Information Nondisclosure Agreement. Both agreements provide, in part, that unauthorized disclosure or mishandling of classified information may violate U.S. law, including Title 18, United States Code, Section 1924.

16.    The SCI Nondisclosure Agreement that GUN signed on December 12, 2023, contains, among other things, the following provision:

> I have been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of SCI by me could cause irreparable injury to the United States or be used to advantage by a foreign nation. I hereby agree that I will never divulge anything marked as SCI or that I or that I know to be SCI to anyone who is not authorized to receive it without prior written authorization from the United States Government or Agency (hereinafter Department or Agency) that last authorized my access to SCI. I understand that it is my responsibility to consult with appropriate management authorities in the Department or Agency that last authorized my access to SCI, whether or not I am still employed by or associated with that Department of Agency or a contactor thereof, in order to ensure that I know whether information or material within my knowledge or control that I have reason to believe might be, or related to or derived from SCI, is considered by such department or Agency to be SCI. I further understand that I am obligated by law and regulation not to disclose any classified information or material in an authorized fashion.

## PROBABLE CAUSE

17.    Beginning on or about May 10, 2024, and continuing through August 9, 2024, there is

probable cause to believe that GUN printed, removed from his workplace, and willfully retained classified information in violation of 18 U.S.C. § 1924.

GUN's Mishandling of Classified Information

18.    Beginning in or before May 2024, GUN printed batches of documents from the Top Secret network while at work and exited the facility shortly thereafter on multiple occasions. A review of print logs showed that most of the documents GUN printed were unclassified; however, on several dates, GUN printed documents with file names the FBI matched to classified intelligence reports or webpages on the TOP SECRET network with visible classification markings.

19.    For example, on or about July 24, 2024, between approximately 4:49 PM and 4:56 PM, GUN printed three documents totaling approximately 52 pages. The file name of one document matched a webpage on the Top Secret network. That webpage bore visible TOP SECRET and SCI sub compartments and classification markings. The classification of one document is unknown. The remaining document appeared to be unclassified. At approximately 5:03 PM, a security camera outside the workplace recorded GUN exiting the facility carrying what appeared to be a drink thermos, rolled papers within a partially translucent shopping bag.

20.    On or about July 25, 2024, GUN printed documents at various times during the workday. Between approximately 1:55 PM and 4:52 PM, he printed 23 documents totaling approximately 196 pages. Two of the documents had file names matching the titles of webpages on the Top Secret network that bore visible TOP SECRET and SCI sub compartments with classification markings. Two of the documents had an unknown classification. The remaining documents appeared to be unclassified. At approximately 5:05 PM, a security camera outside the workplace recorded GUN exiting the facility carrying a partially translucent shopping bag that appeared to contain rolled paper.

21.    On or about July 30, 2024, between approximately 4:03 PM and 4:35 PM, GUN printed approximately 25 documents totaling approximately 246 pages. Two of the documents had file names matching intelligence reports containing visible TOP SECRET and SCI sub compartment classification markings. Based on the information learned to date, it does not appear that the remainder of the documents were classified. At approximately 4:40 PM, a security camera outside the workplace captured GUN exiting carrying a partially translucent shopping bag that appeared to contain rolled paper.

22.    On or about August 1, 2024, between approximately 5:06 PM and 5:18 PM, GUN printed four documents totaling approximately 27 pages. The file name of one of the documents matched an intelligence report bearing TOP SECRET and SCI sub compartments with visible classification markings. Two of the documents had the same file name, which matched the title of a webpage on the Top Secret network bearing TOP SECRET and SCI sub compartment classification markings. Based on the information learned to date, it does not appear that the remainder of the documents were classified. At approximately 5:27 PM, a security camera outside the workplace captured GUN exiting carrying what appeared to be rolled paper.

23.    On or about August 2, 2024, employees of the Air Force Office of Special Investigations (AFOSI) conducted a search of GUN's workspace, to include all drawers, cabinets, and shelves, and did not locate the aforementioned classified documents. GUN's workplace contains one safe for common use, however the combination to each safe drawer is assigned to employees on an individual basis. GUN is not assigned a safe drawer and was not issued a combination. Only one safe drawer was assigned to an employee. AFOSI searched that safe drawer and did not locate the aforementioned classified documents.

24.    On or about August 5, 2024, at approximately 2:37 PM, GUN printed a document

with a file name matching the title of a webpage on the TOP SECRET network with visible SECRET and SCI sub compartment classification markings. At approximately 4:49 PM, he printed a document with a file name matching the title of a webpage on the TOP SECRET network marked as unclassified. At approximately 5:05 PM, FBI personnel observed GUN leave his workplace carrying what appeared to be rolled paper and enter a vehicle registered to him. At approximately 6:31 PM, FBI personnel observed GUN park his vehicle at 7421 Tillman Dr., Falls Church, Virginia (hereinafter "Falls Church residence") and carry a duffel bag from the vehicle into his Falls Church residence.

25.    On August 7, 2024, GUN printed thirty (30) documents totaling approximately 406 pages, and eighty-two (82) matched the titles of intelligence products on the TOP SECRET network, which included pages bearing visible TOP SECRET and SCI sub compartment classification markings. Fifty-nine pages are of unknown classification level. At approximately 5:29 p.m., a security camera located outside GUN's workspace captured GUN exiting the facility carrying a translucent red shopping bag. After GUN departed his workspace, GUN was observed traveling to another of his residences located at 5549 Talon Ct., in Fairfax, Virginia (hereinafter "Fairfax residence") and arrived at approximately 7:09 p.m. He departed the Fairfax residence at approximately 8:50 p.m. and arrived at his Falls Church residence at approximately 9:31 p.m.1 While at his Fairfax residence, GUN was observed operating what appeared to be two cellphones simultaneously, as he held one phone up to his ear while looking at another. Agents confirmed GUN has not been issued a work cell phone.

26.    In sum, between May 10, 2024, and August 7, 2024, GUN printed approximately 256 documents, totaling approximately 3,412 pages. According to GUN's immediate supervisor, GUN is

---

1 Agents possess property records reflecting that GUN owns both properties. Additionally, during the search of the residences on August 9, 2024, agents observed mail addressed to GUN at his houses in Falls Church and Fairfax.

not prohibited or restricted from printing unclassified documents to take home. However, FBI has matched the file names from one hundred fifty-five (155) printed pages to twenty (20) documents on the TOP SECRET network that were marked as classified at the time GUN printed them. Of the 256 documents GUN printed, approximately 191, totaling approximately 2,646 pages, were printed at or after 4:00 PM. According to the facility's security personnel, this time is outside of typical working hours for most employees at that facility.

27.    However, FBI has matched the file names from one hundred fifty-five (155) printed pages from twenty (20) documents on the TOP SECRET network that were marked classified at the time GUN printed them. Approximately 191 of the documents, totaling approximately 2,646 pages, were printed at or after 4:00 PM, which, according to the facility's security personnel, are outside of typical working hours for most employees.

<u>Premises Warrant Execution</u>

28.    On August 8, 2024, Magistrate Judge William B. Porter signed warrants approving FBI's search of GUN's Fairfax and Falls Church residences, along with his vehicle, and any media storage devices seized during the search. Agents executed those searches the morning of August 9, 2024.

29.    GUN was scheduled to depart the United States on a flight to Puerto Vallarta at 6:52 a.m. from Reagan National Airport through Dallas Fort Worth International Airport, Agents executed these warrants in the early morning hours of August 9, 2024. GUN reported to his employer that he would have no travel companions.

30.    Immediately prior to execution of the warrants on August 9, 2024, agents observed a ride share service arrive at GUN's Falls Church residence. Agents watched GUN exit the Falls Church residence with a trash bag, place it in the trash can, and then begin walking back towards the

residence. Agents approached GUN and observed an orange suitcase next to a vehicle in the driveway. GUN went with agents to the entry door of the Falls Church residence. There, they observed a black backpack set against the locked door. GUN verbally provided agents with the pin to the electronic deadbolt.

31.    An initial search of the backpack found a document marked TOP SECRET, and GUN's intelligence community clearance page showing his security clearances.

32.    On his person, GUN had his United States passport and an expired passport from Turkey.

33.    After being advised of his *Miranda* rights, GUN consented to an interview. GUN explained that he was going to Mexico for a fishing trip with two friends. GUN denied ever taking anything classified from his workspace. GUN confirmed that he had no reason to take classified materials to his residences. GUN suggested that, if there were documents with classification markings, the classifications might be expired.

34.    During their search of GUN's Falls Church residence, agents observed stacks of papers in what appeared to be the dining room. Among the papers were multiple documents with visible classification markings, including pages bearing TOP SECRET and SCI sub compartment classification markings. Notably, among the papers found in the Falls Church residence, agents found at least one of the documents marked TOP SECRET that GUN printed on August 7, 2024. The agency that classified that document has confirmed that document bears TOP SECRET classification markings and continues to reside in that Agency's TOP SECRET reporting repository.

## CONCLUSION

35.    Based on the foregoing and my training and experience, I submit there is probable cause to believe that on or about May 10, 2024, and continuing through August 9, 2024, Gokhan

GUN, being an officer, employee, contractor, or consultant of the United States, and by virtue of such office, employment, position, or contract, being possessed of documents or materials containing classified information of the United States, as defined in 18 U.S.C. § 1924(c), knowingly removed such documents or materials without authority and with the intent to retain such documents or materials at an unauthorized location.

36.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


*Madison Ramsden*
Madison Ramsden
Special Agent
Federal Bureau of Investigation


Sworn and subscribed to me this 9th day of August 2024.

Honorable William B. Porter
United States Magistrate Judge